UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JAMONTE ALLGOOD,

                         **Plaintiff,**

      v.                                  Case No. 19-cv-1768

**JOSHUA GOMM,** *et al.*,

                         **Defendants.**

---

### ORDER

---

Plaintiff Jamonte Allgood is proceeding with a claim that defendants Joshua Gomm and Anthony Matushak used excessive force during an escort to the law library on March 28, 2019. (ECF No. 68.) The defendants filed a motion for summary judgment on September 2, 2020. (ECF No. 107.) This order resolves the defendants' motion for summary judgment, along several other motions filed by Allgood after summary judgment briefing was complete. (*See* ECF Nos. 130, 132, 138-139, 147.)

    1. **Factual Background**

At the time of the events in question, Allgood was an inmate at the Green Bay Correctional Institution (GBCI). (ECF No. 109, ¶1.) Defendants Joshua Gomm and Anthony Matushak were correctional officers at GBCI. (*Id.*, ¶¶2-3.)

According to Allgood, at around 6:45 a.m. on March 28, 2019, Matushak and Gomm came to his cell to take him to the law library. (ECF No. 117, ¶¶1-3.) The

defendants gave him a series of instructions on what to do to apply restraints for the escort, and Allgood states that he "complied" with all the instructions. (*Id.*, ¶¶4-8.) Allgood explains, "Matushak had some sort of dispute about a lawsuit with plaintiff." (*Id.*, ¶9.) Allgood responded to Matushak by saying, "y'all just mad cause I'm filing lawsuits, y'all don't like that." (*Id.*, ¶10.) The escort then began. (*Id.*, ¶¶11-12.) As they walked down the hall, Gomm and Matushak were "yelling" at Allgood because of his lawsuits. (*Id.*) "Without warning, Gomm and Matushak forced plaintiff to the wall, grabbing his head and slamm[ing] his face up against the wall repeatedly using excessive force to apply pressure to the side of his face, pinning him to the wall." (*Id.*, ¶13.) "One of the defendants grabbed [Allgood's] head and slammed his face up against the wall repeatedly." (*Id.*, ¶17.) Allgood states that he did not make any threats, break any prison rules, or tense up his biceps; he was simply walking down the wing facing forward. (*Id.*, ¶¶14-16.) Allgood experienced pain, dizziness, blurred vision, and headaches. (*Id.*, ¶17.)

The defendants dispute Allgood's version of events and have attached three body-camera videos confirming most of their proposed findings of fact. (*See* ECF No. 109; *see also* Matushak Body-Camera Video, ECF No. 110-1; Gomm Body-Camera Video, ECF No. 110-3; and Frueboldt Body-Camera Video, ECF No. 110-4.) The body-camera videos have audio, which clearly establish that Allgood's version of what was said during the incident is mostly false. (*See id.*)

Matushak's body-camera video shows him arrive at Allgood's cell and ask if he wants to go the law library; Allgood indicates that he does. (ECF No. 109, ¶¶4,6.)

Gomm arrived at the cell shortly thereafter. (*Id.*, ¶7.) In the video footage, a third individual, Officer Frueboldt (who is not a defendant) is also standing in front of Allgood's cell. (*See* Matushak Body-Camera Video, ECF No. 110-1; Gomm Body-Camera Video, ECF No. 110-3; and Frueboldt Body-Camera Video, ECF No. 110-4.) Matushak and Gomm apply wrist restraints on Allgood through the trap door. (ECF No. 109, ¶¶7-8.) Once the defendants apply wrist restraints, the cell door was opened and Allgood stepped out of his cell. (ECF No. 109, ¶¶8,13.)

Gomm's body-camera video shows him then place both his hands on Allgood's left arm to assist him to the ground so that ankle restraints could be applied. (Gomm Body-Camera Video, ECF No. 110-3, at 2:35-2:36.) Gomm says, "you gonna take a knee?" (*Id.*) Allgood became agitated and argumentative. (*Id.* at 2:36-2:50.) He stated that he can bend down himself and he refused several staff orders to face forward and take a knee. (*Id.*) Allgood called the officers "crazy mother-fuckers" and said that he can "look at [Gomm] all he wants." (*Id.*) The videos show Allgood arguing with the defendants and looking around while they tell him to face forward so that they could apply ankle restraints.

The defendants explain that inmates are directed to face forward for staff safety. (ECF No. 109, ¶15.) Inmates often make "target glances" to determine where officers are standing prior to an attack. (*Id.*) The requirement to face forward prevents target glancing. (*Id.*) Frueboldt's body-camera video captures him explaining to Allgood that he cannot make "threats" or "target glances" at staff and that he must face forward. (*See* Frueboldt Body-Camera Video, ECF No. 110-4.)

3

Allgood ignored these statements and reiterated that they were using "excessive force," even though the videos clearly show that they were not. (*Id*.) The ankle restraints were then secured, followed by a waist restraint, and the escort to the law library began. (*See* Matushak Body-Camera Video, ECF No. 110-1, at 3:00-3:35.)

During the escort, Gomm held Allgood's left arm and Matushak held Allgood's right arm. (ECF No. 109, ¶12.) As they walked down the hall, the body-camera videos show Allgood's body from the shoulders down; it does not clearly show his head. (Matushak Body-Camera Video, ECF No. 110-1; Gomm Body-Camera Video, ECF No. 110-3; and Frueboldt Body-Camera Video, ECF No. 110-4.) The audio captures the defendants telling Allgood to face forward while Allgood continued arguing with them. (*See id*.)

According to Matushak and Gomm, as they walked down the hall they could feel Allgood tensing up his biceps. (ECF No. 109, ¶16.) They then saw Allgood make "target glances" and he stopped walking. (*Id*.) The defendants perceived this as a threat to their safety because Allgood had been disruptive and agitated, he refused to face forward while walking, and he was swearing and upset. (*Id*., ¶¶17-18.) They explain that there was an additional risk to their safety because Allgood's wrists were restrained in front of his body. (*Id*., ¶14.) Having restraints in front allows for a broader range of movement than when restraints are applied behind the body. (*Id*.) As a result, an inmate is more balanced while on his feet, and it is more difficult for correctional staff to get the inmate off-balance to get him under control if he resists. (*Id*.)

4

Gomm and Matushak then "stabilized" Allgood to the wall for about 10 seconds. (ECF No. 109, ¶19.) Stabilization means placing an inmate in a fixed location or position so correctional staff can gain control over the situation. (*Id.*, ¶20.) This can include verbal commands and/or physical restraint against a wall. (*Id.*) Matushak's body-camera video shows his hands on Allgood's arm and shoulder at the beginning and at the end of the 10 second stabilization period; there is a brief second period in the middle where the screen is black and his hands are not visible. (*See* Matushak Body-Camera Video, ECF No. 110-1, at 3:40-3:57.)

Likewise, Gomm's body-camera video shows his hands on Allgood's arm and shoulder at the beginning and at the end of the 10 second stabilization period; again, there is a brief second period in the middle where the screen is black and his hands are not visible. (*See* Gomm Body-Camera Video, ECF No. 110-3, at 3:30-3:47.) Frueboldt's body-camera video fills in most of this gap and shows Gomm and Matushak using their bodies to press Allgood against the wall with their hands on his arm and shoulder throughout the incident. (*See* Frueboldt Body-Camera Video, ECF No. 110-4, at 0:40-0:55.)

Allgood then stated that he wanted to "refuse" law library, at which point the defendants took him back to his cell. (ECF No. 109, ¶21.) The videos clearly show that Allgood was able to talk, kneel, move his neck and head, and stand up. (*Id.*, ¶22.) The nurse's notes from the same day indicate that Allgood was able to move around freely, bend and twist without issue, and "whip" his head. (ECF No. 110-2 at 5.) But Allgood had reported that his pain was "10/10" and that his "front

5

Case 2:19-cv-01768-WED Filed 04/08/21 Page 5 of 12 Document 150

teeth got chipped." (*Id.*)

**2. Legal Standard**

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). When considering a motion for summary judgment, the court takes evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)-(B). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### 3. Analysis

To survive summary judgment on an Eighth Amendment excessive force claim Allgood must present evidence from which a reasonable jury could conclude that the defendants applied force maliciously and sadistically to cause harm rather than in a good-faith attempt to maintain or restore discipline. *Caffey v. Maue*, 679 F. App'x 487, 491–92 (7th Cir. 2017); *see also Jackson v. Angus*, 808 F. App'x 378, 382 (7th Cir. 2020). The court examines: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." *McCottrell v. White*, 933 F.3d 651, 663 (7th Cir. 2019).

The defendants assert that they are entitled to summary judgment because video evidence establishes that they used a minimal amount of force to control Allgood's disruptive behavior during the escort. The three body-camera videos they

7

Case 2:19-cv-01768-WED   Filed 04/08/21   Page 7 of 12   Document 150

attached as evidence confirm almost all of their proposed findings of fact. The videos clearly show that Allgood was disruptive and agitated from the moment he exited his cell, that he was arguing with the defendants and ignoring their orders to face forward, that he was calling them names and using angry language, and that he suddenly stopped as they walked during the escort. The videos also capture the defendants calmly and repeatedly telling Allgood to face forward throughout the incident and they capture Frueboldt explaining that refusing to face forward put staff at risk. Finally, the videos also confirm that the defendants stabilized Allgood against the wall for a very brief period of time (about 10 seconds) using a trained security technique, and that Allgood was clearly talking, walking, and oriented after the incident.

The court cannot tell from the videos whether Allgood "tensed" up his biceps during the escort. It also cannot see Allgood's head for very brief moments of time. During these moments, the videos either show Allgood's body from the shoulders down or the screen is black while the body-cameras are covered. But these apparent factual disputes do not preclude summary judgment. *See e.g. Boyd v. Pollard*, 621 Fed. Appx. 352, 355-56 (7th Cir. 2015).

In *Boyd*, the plaintiff alleged that guards used excessive force during a cell extraction when they body-slammed him onto a concrete floor, placed him in a chokehold, and hit him in the face and head. 621 Fed. Appx. at 354. The defendants denied these allegations and a video confirmed most of the defendants' account, except for brief times when the plaintiff was out of camera view. *Id.* The Seventh

Circuit Court of Appeals recognized that certain portions of the video were inconclusive and that the parties had presented different versions of the events. *Id*. But it nonetheless determined that "no juror who viewed the video could reasonably conclude—given the professional behavior of [the defendants] and minor injury sustained by [the plaintiff]—that the guards, when outside the camera's view, attacked [the plaintiff.]" *Id*. at 356.

The same is true in this case. The videos show defendants' professional and appropriate behavior for almost all of the incident. There are only a couple brief moments when Allgood's head and/or biceps are out of view. Based on these videos, no reasonable jury could credit Allgood's version of what happened during those brief moments. In fact, most of Allgood's account of what happened on that day is blatantly contradicted by the videos. At no point during the videos do any of the defendants or Allgood discuss his prior lawsuits. The defendants never "yell" at Allgood because of his lawsuits. And the videos clearly show that Allgood was not "complying" with their orders.

There also is no evidence from which a reasonable jury could conclude that the defendants "grabbed" Allgood's head/face and slammed it against the wall. Between the three body-camera videos, Matushak and Gomm's hands can be seen for almost all of the brief stabilization period. No reasonable jury who views the videos could conclude that Matushak and Gomm were using their hands to stabilize Allgood's arm and shoulder while simultaneously (and apparently very quickly) also "grabbing" his head/face and slamming it against the wall. The audio of the incident

does not contain sounds of impact that could lead a jury to reasonably conclude that Allgood's head was hit against the wall during that very short period of time.

Based on videotape evidence, no reasonable jury could credit Allgood's version of events and find in his favor. The videos establish that the defendants used a minimal amount of force to stabilize Allgood against the wall because his disruptive behavior posed a threat to their safety. Accordingly, the defendants are entitled to summary judgment and the court will dismiss this case.

**4. Other Pending Motions**

After summary judgment briefing was complete, Allgood filed five additional motions seeking sanctions, injunctions, and to reopen discovery. (ECF Nos. 130, 132, 138-139, 147.) The court has already denied these motions in past orders and it will do so again here.

As explained in a prior order, discovery closed in August 2020 and the court will not reopen discovery at this time. (*See* ECF No. 129.) Although Allgood claims that he never got to review the body-camera videos from the incident, he experienced the incident and is fully aware of what happened to him. Allgood was not prejudiced by his purported inability to watch the videos. In any case, if Allgood had wanted to watch the videos before drafting his response materials, he should have requested to do so while discovery was still open. The court will deny his motions to reopen discovery. (ECF Nos. 138 and 147.)

As to Allgood's requests for injunctions and restraining orders, Allgood's complaint involves a completed act of harm. There are no on-going violations that

need to be addressed through an injunction or a restraining order. To the extent Allgood believes that the defendants are "retaliating" against him, he should file a grievance at the institution. This lawsuit only involves one incident of excessive force. Allgood cannot raise complaints of "retaliation" though this lawsuit. The court will deny his motions seeking injunctions. (ECF Nos. 130 and 139.)

Finally, with respect to his request for "sanctions," Allgood states that the defendants are "lying" about the facts in this case. (*See* ECF No. 132.) The videos show otherwise. Allgood has no basis to seek sanctions. The court will deny his motion for sanctions. (ECF No. 132.)

5. **Conclusion**

**NOW, THEREFORE, IT IS ORDERED** that the defendants' motion for summary judgment (ECF No. 107) is **GRANTED**, and the remainder of the motions in this case (ECF Nos. 130, 132, 138-39, and 147) are **DENIED**. This case is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from

judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 8th day of April, 2021.

*William E. Duffin*
WILLIAM E. DUFFIN
U.S. Magistrate Judge